120

(C. D. 673)

Wilbur Ellis Co. et al. *v.* United States

United States Customs Court, Second Division

(Decided August 3, 1942)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiffs.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *Frank X. O'Donnell*, special attorneys), for the defendant.

Before Tilson, Kincheloe, and Dallinger, Judges; Tilson, J., and Kincheloe, J., concurring in conclusion only

Dallinger, Judge: These are suits against the United States, arising at the ports of San Francisco, Calif., and Portland, Oreg., brought to recover certain customs duties alleged to have been improperly exacted on particular importations of bale ties. Duty was levied thereon at the rate of 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for. It is claimed that said articles are properly dutiable at the rate of ½ cent per pound under the provision in paragraph 317 of said act for "all wire commonly used for baling hay or other commodities"; or, alternatively, that the articles are entitled to free entry under paragraph 1604 of said act as agricultural implements.

At the first hearing, held at Los Angeles on October 8, 1940, before Evans, Judge, the record in *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. 403, C. A. D. 47, was, without objection, incorporated in

and made part of the record in this case and marked exhibit 1. The plaintiffs then offered in evidence the testimony of three witnesses. The first, R. P. Oldham, identified certain samples of the merchandise and they were admitted in evidence as plaintiff's collective exhibit 2.

The second witness, Hubert F. Hodson, testified that as a rancher owning 15 acres, but operating 1,500 acres, in the San Fernando Valley, he had used articles like collective exhibit 2 solely for the purpose of baling hay; that he had been the owner of baling machines for the last 12 years; that during that time he had used such machines for baling his own hay as well as for baling hay for other ranchers who could not afford to own a similar machine; and that the baling was always done on the ranch or farm.

The third witness, John H. Birch, another rancher, testified that he operated a ranch of 500 acres in the Tuscany Valley; that he had baled hay both for himself and for other ranchers and that the baling was always done on the farm; and that he had paid $1,200 for his baling machine.

The Government then offered in evidence the testimony of G. M. McDowell, associated with the Western Consumers Feed Co., who testified that he had bought many thousands of tons of hay in the States of California, Nevada, and Arizona; that he had gone to the farms to buy the hay; that he was thoroughly familiar with the machine known as a hay baler and with bale ties similar to those represented by collective exhibit 2 herein; that he has often seen hay baled on different farms; and that after the hay was baled it was sent to the market, principally to Los Angeles.

The witness then proceeded to testify in part as follows:

Q. Have you seen hay disposed of in any way than by being baled and removed from the farm and sent to market?

Mr. TUTTLE. That is objected to as immaterial.

Mr. WEEKS. The point is that when a farmer gets hay off his own farm it is not baled, and therefore a bale tie is not used on it, and therefore a bale tie is not an agricultural implement because the hay which is agricultural, and dedicated to an agricultural use, is not baled. It is the hay which entered into the commerce of the United States. That is the subject of commerce. That is the purpose of my question.

  *       *       *       *       *       *       *

Judge EVANS. * * *. The farmer doesn't keep the wheat on his own farm, but sells it to a buyer. Would you call a binder or a combined threshing machine that takes the wheat and binds it into bundles for later shipment, would you call that an agricultural implement?

Mr. WEEKS. That is a different case. It is part of agriculture to separate the wheat from the land and with the use of that harvester or binder you are separating the wheat from the land. That is entirely different from this question here. This is a question whether it has to be used to feed the farmer's stock, which I take it would be agricultural, or whether it enters into the commerce of the United States through a feed store. In each case, the hay is agricultural;

the hay is the subject of commerce. The hay is dedicated to agricultural use and the bale tie, which the evidence in the incorporated record already shows, is necessary to keep the bale of hay in such shape so you can move it, is not an agricultural implement. The hay has become the subject of commerce before the bale tie is put around it.

Judge Evans. From your theory of the case then whatever was used to harvest it to put it in a marketable condition would not be an agricultural implement?

Mr. Weeks. Yes, to put it in a marketable condition, but not in a condition to be sold. From the minute it is sold, it is no longer agricultural according to my theory of the case.

Judge Evans. I will take your question for the sake of allowing you to develop your case, and allow an exception.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. [Read by the reporter.] Have you seen hay disposed of in any way than by being baled and removed from the farm and sent to market?—A. Yes, I have. We have a great many dairies and a great many chicken farms here in California and in some sections the hay is grown for grazing, or for feeding the cattle. The cattle are turned loose in the field to feed on the hay.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. When it is stacked in the field, is it or is it not baled, according to your observation?—A. In most cases, it is stacked loose.

Q. And is there any bale tie used in connection with it?—A. Not when it is stacked loose or in the barns.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. What has been your observation in cases of that kind with reference to whether the hay has been baled or not?—A. It depends on the section. In some places they store it baled. They bale the hay for future use, where the hay is cut over a period that covers the summer, or say from April to November, and then to provide for feed for the rest of the season the hay is stored. Sometimes it is baled and sometimes it is not when it is stored, but it is put in storage until consumed by the feeder.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. During the time you have been in business, and up to 1930 and including 1930, according to your observation, has there been more hay baled or more hay not baled?—A. Well, I would say more is baled than not baled. \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. In cases, Mr. McDowell, where you have bought hay have you bought it on the stack or growing out of the ground, or was it baled?—A. In the good majority of cases, we buy it after it is baled.

Q. If hay is baled and you have bought it, is there anything necessary for the farmer to do with it before you carry it away?—A. Well, in the cases of these modern travelling presses they have now-a-days where they take the hay right out of the window and drop it into a bale, it is customary for the farmer to pack the bales and haul them to the roadside where they can be picked up.

At the close of this witness' testimony the following colloquy took place:

Mr. Tuttle. I don't believe in offering the record in Suit 4195, I asked government counsel if he would stipulate that the merchandise there is the same as that involved in the instant case.

Mr. Weeks. I will so stipulate.

The case was then transferred to the current San Francisco docket.

At the second hearing, held at San Francisco on October 14, 1940, before Evans, Judge, counsel for the Government offered five motions for commissions to take the testimony by deposition of 104 witnesses scattered throughout the country. Counsel for the plaintiffs objected to the granting of the motions, citing rule 24 of the rules of this court, which rule reads as follows:

Commissions * * * shall be issued under the seal of the court to examine witnesses resident in * * * a distant part of the United States, whenever it shall appear to the satisfaction of a judge, or a division before which the case is pending, that the testimony of said witnesses is necessary and important in such case and that the attendance of such witnesses cannot reasonably be had.

Counsel for the plaintiff aptly pointed out that the type of testimony sought to be obtained from the 104 witnesses named in the several motions was neither necessary nor important in the cases at bar for the reason that in the incorporated case of *Wilbur-Ellis Co.* v. *United States, supra,* the appellate court had decided "That growing and preparing hay for the market, including baling, is an agricultural pursuit, cannot be questioned."

The trial judge reserved decision upon the five motions in question for the Second Division of this court, and the Government then offered the testimony of E. L. Kyte, associated with the Granada Co., a wholesale hay and grain firm, for the past 19 years. He testified that during that period he had bought hay in Washington, Oregon, California, Nevada, Idaho, and Arizona; that he had often seen hay baled on farms with the use of bale ties; that after the hay had been baled it was either loaded on a truck and delivered to a railroad car in which it was shipped to market, or loaded on wagons and trucks and hauled to a public warehouse where it was stored for sale and shipment later; and that where hay was not baled it was fed on the farm where it was grown, in which case bale ties were not used.

On cross-examination the witness testified in part as follows:

X Q. When you buy it, is it already baled?—A. We buy it in the stack, loose, we buy it baled, and we buy it unbaled.

X Q. How did you buy the largest quantity, baled, loose, in the stack, or unbaled?—A. In the bale, already baled.

X Q. Have you ever in all those western States to which you have referred, ever seen bales of hay on a farm or on a ranch that were not being hauled away to a public warehouse or to a railroad station?—A. Yes, they are generally stored in a barn for sale later.

X Q. How do you know they are for sale later?—A. Because we buy a considerable quantity out of farm barns where they are for sale.

* * * * * * *

X Q. Can you state as a fact that farmers do not bale hay and keep the hay on the farm?—A. No.

The Government then offered in evidence the testimony of Horace M. Bull, a hay buyer in the employ of the P. H. Russell Co., wholesale

hay dealers in San Francisco, who testified that he had been engaged in the business of buying hay since 1919; that he had seen bale ties used on farms in California and Oregon where he had gone to buy hay; that he had bought hay when it was still growing, when it was stacked, and also when it was baled; that after the hay was baled he had seen it shipped to various markets, stored on the ranches, or stored in public warehouses for winter markets; and that in some cases a farmer kept baled hay on his farm and used it for feed, but that that is not the usual practice.

On cross-examination the witness testified in part as follows:

X Q. Government counsel asked you about the use of these bale ties, of 15 gauge and varying in lengths from eight to ten feet, and I believe you said they were used in baling hay as far as you know.—A. Yes.

\* \* \* \* \* \* \*

X Q. Do you know if any other articles, or other forms of wire, were ever used for baling hay in California or Oregon, in your experience?—A. Excepting bale ties?

X Q. Except bale ties, Yes.—A. Not in 1930. I don't know of any other form being used that recently.

At the close of the testimony the following colloquy took place:

Mr. TUTTLE. In reference to the first three motions discussed in yesterday's argument I am ready right now to concede that if the witnesses referred to in those motions were called they would testify in the manner stated in the government's motions.

\* \* \* \* \* \* \*

Mr. WEEKS. I am not interested in Mr. Tuttle's concession at all. He is very willing to take advantage of the poor and insufficient way in which my moving papers have been drawn. I will do much better with my witnesses than my affidavits state \* \* \*.

Judge EVANS. There is a law that states you are bound by your moving papers, and that you are limited to prove what is set out in your moving papers.

Mr. WEEKS. But I can get more out of my witnesses than my affidavits state.

Judge EVANS. The court will take that offer to concede such testimony under advisement and submit it, together with the motions to take the testimony by deposition, to the Second Division for action by the Division. \* \* \*.

The cases were then transferred to Portland, Oreg.

At the hearing in the latter city, held on October 23, 1940, also before Evans, Judge, protests Nos. 965486–G and 793095–G, being Portland entries, were consolidated with protest 983271–G, and it was agreed by counsel for both sides that the merchandise covered by said protests was the same as that involved in the case of *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. 403, C. A. D. 47, which case was again incorporated herein.

The Government then offered in evidence the testimony of A. H. Porter, the owner of a ranch or farm at Brownsville, Oreg., since 1927 who testified that on said farm he ususally cuts about 100 tons of hay and 50 tons of straw each year; that as a rule he sold more than he

consumed; that he had baled hay not only for himself but for other farmers, using bale ties; that some of the hay and straw grown on his ranch is consumed on his ranch; that the latter is baled the same as the hay which is sold, for the reason that it requires a smaller space for storage; that most of the farmers of his acquaintance sell more hay than they consume on the farm; and that in the majority of cases the hay not sold is fed on the farm loose.

On cross-examination the witness testified in part as follows:

X Q. What is the main purpose of your farm, grain or cattle?—A. To raise grain, principally.

X Q. Does that include the raising of hay?—A. Yes, the raising of hay.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Is that completed after you have baled the product?—A. We can't bale the hay until we get it raised.

X Q. That's true. But what I want to find out is whether the baling of hay is part of your business?—A. Yes.

At the close of the witness' testimony, the case was retransferred to San Francisco. In the meantime, on May 13, 1941, the Government's five motions for the issuance of commissions were denied by this Division. Although we did not state our reasons for such denial at the time, because we considered them too obvious, inasmuch as Government counsel, in his brief filed herein, stresses the absence of such reasons, we now state them.

We believed then, and still believe, that the testimony of the hundred or more witnesses sought by the Government was neither necessary nor important to the issue involved herein.

The issuance of said commissions would have encumbered the record with cumulative evidence resulting in an unjustifiable delay in the final decision of the case, which would be a gross injustice to the importer herein.

Moreover, the material facts sought to be proved through this army of witnesses are not seriously challenged by counsel for the importers.

Finally, the issue already has been decided by the United States Court of Customs and Patent Appeals in the case of *Wilbur-Ellis Co.* v. *United States, supra,* and the record therein has been incorporated herein.

On August 15, 1941, counsel for the Government filed with this court an alternative motion that the instant cases be either set down for a hearing at the next Indianapolis term, or that a commission be issued to take the testimony of eight additional witnesses. On October 9, 1941, this motion was denied by this Division for the reasons already set forth.

At the final hearing, held at San Francisco on November 27, 1941, counsel for the Government moved that the cases be transferred to

Minneapolis; Portland, Maine; and Houston, Tex., on the ground that at those ports there were available certain witnesses who would testify that bale ties are chiefly used by baling contractors, and are seldom used by individual farmers. The said motion was denied by the trial judge, and an exception allowed the Government. In denying the motion the trial judge said:

* * *. As I understand it, the only contention made by the Government is that because certain contractors run these baling machines on various farms throughout the country they are therefore not agricultural implements. It is just exactly like the threshing machines used about a farm. Because the farmer himself may not use the threshing machine, would you say it is not an agricultural implement? It seems to me that the fact the baling machine is used by contractors is wholly immaterial. I can't see that anything will be gained by transferring this case to get such evidence as the Government has outlined in its motion. * * *.

The cases were then submitted by both sides, time being allowed counsel for the filing of briefs.

Upon this record counsel for the Government in his brief filed herein contends that the bale ties constituting the imported merchandise at bar are not agricultural implements within the meaning of paragraph 1604 of the Tariff Act of 1930, and cites numerous cases in support of such contention. We have carefully examined all of the cited cases and in our opinion none of them has any application to the facts established herein.

Apparently, the theory of the Government is that although it is conceded that the bale ties in question are exclusively used on the farm for baling hay, nevertheless because a considerable part, if not most, of the hay after being baled is sold in the market, that therefore the ties in question cease to be agricultural implements. In our opinion, such a theory is absurd, since it is well known that the farmers of the country support themselves by selling their products.

In the case of *J. C. Findlay* v. *United States*, T. D. 37964, G. A. 8246, 36 Treas. Dec. 283, decided as early as March 31, 1919, this court (then the Board of General Appraisers) had before it certain wool presses used exclusively on sheep ranches to press the wool cut from the sheep into bales preparatory to transporting the same to market. In holding that such wool presses were agricultural implements and therefore entitled to free entry under paragraph 391 of the Tariff Act of 1913, this court, after reviewing the decisions of the Court of Customs Appeals in *United States* v. *Boker*, 6 Ct. Cust. Appls. 243, T. D. 35472, and *United States* v. *Irwin*, 7 Ct. Cust. Appls. 360, T. D. 36906, said:

We are satisfied that the court did not intend to limit the meaning of the word "production" to apply only to the implements which are employed in the initial act of cutting down the grown crops of the soil or to merely shearing the wool from the sheep. Before they can begin to furnish food or clothing for man, such crops

must be garnered, stored, and placed in convenient form and condition for storage and transportation, and therefore their production does not cease until they have been introduced into the channels of trade as farm or ranch crops ready to have applied to them the first stage of preparation which will ultimately render them adaptable as food or raiment for man. This liberal interpretation of the word "production" is amply supported by the provisions of the paragraph in question. Congress not only specifically mentions such implements as mowers, reapers, and harvesters, but goes further and classifies as agricultural implements the wagons and carts which are used on the farm to transport the crops to the market. *Obviously, it was likewise the legislative purpose to similarly classify the various implements and devices which are necessarily employed by the farmer or ranchman or dairyman in placing his products in convenient form for transportation. Such implements and devices are unquestionably covered by the general provision in the paragraph for "all other agricultural implements of any kind and description, whether specifically mentioned herein or not, whether in whole or in parts, including repair parts."*

Included in the latter category would be such contrivances as the wool presses here in question. If they manipulated the wool product so as to change its condition or advance it along the manufacturing line, we would seriously question the propriety of classifying them as agricultural implements, as those words have been judicially interpreted in the *Boker* case, *supra*. But, inasmuch as they are used exclusively for no other purpose than *to bale the wool preparatory to transporting it, we see no reason for excluding them from the scope of the paragraph.*

\*        \*        \*        \*        \*        \*        \*

Inasmuch as we would have no hesitancy in including within the intent of the paragraph such an implement as a hay press, we can not deny the same classification to these wool presses. [Italics ours.]

The above decision was never appealed from, and it is therefore the law and, in our opinion, is here controlling at least to the extent of holding that the process of baling hay on the farm is an agricultural operation.

In *Wilbur-Ellis Co.* v. *United States, supra,* (the record in which has been incorporated herein) the United States Court of Customs and Patent Appeals has gone one step further in holding that the bale ties used in baling hay on the farm are in themselves agricultural implements. We can see no force in the Government's contention that such a holding is mere *dicta*. We may not so treat the ruling of the court which was expressed in the following language:

That growing and preparing hay for the market, including baling, is an agricultural pursuit, cannot be questioned. See *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Ducommun Hardware Co.*, 7 Ct. Cust. Appls. 353, T. D. 36904; *United States* v. *Irwin & Co.*, 7 Ct. Cust. Appls. 360, T. D. 36906; *United States* v. *Spreckels Creameries, Inc.* 17 C. C. P. A. (Customs) 400, T. D. 43835; *United States* v. *S. S. Perry, supra*.

The involved steel bale ties are not mere material, such as wire commonly used for the baling of hay or other commodities, they are completely manufactured articles. *M. Martinez & Co.* v. *United States, supra*.

\*        \*        \*        \*        \*        \*        \*

The trial court found from the evidence of record, which finding is not here challenged by counsel for the Government and is supported, we think, by the

128

evidence, that steel bale ties like those here involved are chiefly used in the baling of hay. They are used to hold the compressed hay in its compressed form. They are, in a sense, containers. When in use, they retain their identity as bale ties, just as the hay retains its identity as hay. * * *

*      *      *      *      *      *      *

The involved articles are used extensively in preparing hay for the market, and perform an important agricultural function. They are obviously implements within the broad meaning of that term, and, in our opinion, there can be no justification in holding that they are not agricultural implements within the purview of paragraph 1604, *supra.*

Upon the facts and the law we therefore hold that the bale ties constituting the imported merchandise at bar are agricultural implements within the meaning of said paragraph 1604, and as such are entitled to free entry, as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.